UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------ X

RICHARD MANSELL,          :

                  :

          Plaintiff,    :     CASE NO.: _____

                  :

      -against-     :

                  :

SUNCOKE ENERGY, INC., MICHAEL G.  :
RIPPEY, ALVIN BLEDSOE, SUSAN R.  :
LANDAHL, PETER B. HAMILTON,    :
ROBERT A. PEISER, JOHN W. ROWE, and  :
JAMES E. SWEETNAM,        :

                  :

       Defendants.   :

                  :

------------------------------------------ X

## COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934

Plaintiff Richard Mansell ("Plaintiff"), on behalf of himself, by and through his attorneys, alleges the following upon information and belief, including investigation of counsel and review of publicly available information, except as to those allegations pertaining to Plaintiff, which are alleged upon personal knowledge:

## NATURE OF THE ACTION

1.    This is an action brought by Plaintiff against SunCoke Energy, Inc. ("SunCoke" or the "Company") and the members of the Company's board of directors (collectively referred to as the "Board" or the "Individual Defendants" and, together with SunCoke, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a) respectively, and United States Securities and Exchange Commission ("SEC") Rule 14a-9, 17 C.F.R. § 240.14a-9.  Plaintiff's claims arise in connection with the proposed acquisition of SunCoke Energy Partners, L.P. ("SXCP") by SunCoke.

2.    On February 4, 2019, SunCoke and its wholly owned subsidiary SC Energy

Acquisition LLC ("Merger Sub" and, together with SunCoke, the "SunCoke Parties") entered into an Agreement and Plan of Merger (the "Merger Agreement") with SXCP and its general partner SunCoke Energy Partners GP LLC ("SXCP General Partner" and, together with SXCP, the "SXCP Parties").  Pursuant to the Merger Agreement, Merger Sub will be merged with and into SXCP, with SXCP being the surviving entity (the "Proposed Transaction").

3.      Under the terms of the Merger Agreement, each outstanding common unit representing limited partner interests in SXCP (the "SXCP Common Units") that is held by a unitholder other than SunCoke and any entities that are partially or wholly owned and controlled, directly or indirectly, by SunCoke, including Merger Sub, Sun Coal & Coke LLC ("SC&C") and SXCP (such units, the "SXCP Public Units"), will be converted into the right to receive (x) 1.40 shares of validly issued, fully paid and non-assessable SunCoke common stock, par value $0.01 per share ("SunCoke Common Stock") and (y) a fraction of a share of SunCoke Common Stock equal to the product of (aa) the number of days beginning with the first day of the most recent full calendar quarter with respect to which an SXCP unitholder distribution record date has not occurred (or, if there is no such full calendar quarter, then beginning with the first day of the partial calendar quarter in which the Closing (as defined in the Merger Agreement) occurs), and ending on the day immediately prior to the Closing, multiplied by (bb) a daily distribution rate that is equal to the quotient of the most recent regular quarterly cash distribution paid by SXCP divided by 90, such product divided by $10.91, which was the closing price of the SunCoke Common Stock as of February 1, 2019, the last full trading day prior to the date of the execution of the Merger Agreement (the "Merger Consideration").

4.      If the Proposed Transaction is consummated, SunCoke stockholders aggregate interest will be *immediately* diluted.  *See* Proxy at 54.

5.      On April 30, 2019, in order to convince SunCoke's public common stockholders to vote in favor of the issuance of SunCoke Common Stock pursuant to the terms of the Merger Agreement in connection with the Proposed Transaction (the "Parent Stock Issuance")[1], Defendants authorized the filing of a materially incomplete and misleading Form S-4/A Registration Statement (the "Proxy") with the SEC, in violation of Sections 14(a) and 20(a) of the Exchange Act.

6.      In particular, the Proxy contains materially incomplete and misleading information concerning: (i) financial projections for SunCoke, SXCP, and the certain projected cost savings and U.S. federal income tax synergies to result from the Proposed Transaction (the "Projected Cost Savings and Synergies") that were all prepared by Company management; (ii) the valuation analyses performed by SunCoke's financial advisor, Evercore Group L.L.C. ("Evercore"), in support of its fairness opinion; and (iii) the potential conflict of interest Evercore faced as a result of the prior work its performed for SunCoke.

7.      The special meeting of the Company's stockholders to vote on the Parent Stock Issuance is set for June 27, 2019.  It is therefore imperative that the material information that has been omitted from the Proxy is disclosed prior to the special meeting of SunCoke stockholders so Plaintiff can properly exercise his corporate voting rights.

8.      For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9. Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Transaction unless and until the material information discussed below is disclosed to SunCoke's

---

[1]    The closing of the Proposed Transaction is conditioned upon approval of the Parent Stock Issuance.

public common stockholders sufficiently in advance of the special meeting of the Company's stockholders or, in the event the Proposed Transaction is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

7.    This Court has jurisdiction over all claims asserted herein pursuant to Section 27 of the 1934 Act because the claims asserted herein arise under Sections 14(a) and 20(a) of the 1934 Act and Rule 14a-9.

8.    Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over each Defendant by this Court permissible under the traditional notions of fair play and substantial justice. "Where a federal statute such as Section 27 of the [Exchange] Act confers nationwide service of process, the question becomes whether the party has sufficient contacts with the United States, not any particular state." *Sec. Inv'r Prot. Corp. v. Vigman*, 764 F.2d 1309, 1315 (9th Cir. 1985). "[S]o long as a defendant has minimum contacts with the United States, Section 27 of the Act confers personal jurisdiction over the defendant in any federal district court." *Id.* at 1316.

9.    Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as 28 U.S.C. § 1391, because Defendants are found or are inhabitants or transact business in this District.  Indeed, SunCoke's common shares trade on the Nasdaq, which is also headquartered in this District. *See, e.g., United States v. Svoboda*, 347 F.3d 471, 484 n.13 (2d Cir. 2003) (collecting cases).

## PARTIES

10.     Plaintiff is, and has been continuously throughout all times relevant hereto, the holder of SunCoke common shares.

11.     Defendant SunCoke is a Delaware corporation that maintains its principal place of business at 1011 Warrenville Road, Suite 600, Lisle, Illinois 60532.  SunCoke's common shares are traded on the Nasdaq under the ticker symbol "SXC."

12.     Defendant Michael G. Rippey is, and has been at all relevant times, a director of the Company, and currently serves as the President and Chief Executive Officer of SunCoke.

13.     Defendant Alvin Bledsoe is, and has been at all relevant times, a director of the Company.

14.     Defendant Susan R. Landahl is, and has been at all relevant times, a director of the Company.

15.     Defendant Peter B. Hamilton is, and has been at all relevant times, a director of the Company.

16.     Defendant Robert A. Peiser is, and has been at all relevant times, a director of the Company.

17.     Defendant John W. Rowe is, and has been at all relevant times, a director of the Company, and currently serves as Chairman of the Board.

18.     Defendant James E. Sweetnam is, and has been at all relevant times, a director of the Company.

19.     The defendants identified in paragraphs 12 through 18 are collectively referred to herein as the "Board" or the "Individual Defendants," and together with SunCoke, the "Defendants."

## SUBSTANTIVE ALLEGATIONS

**Background of the Company and the Proposed Transaction**

20.     SunCoke is a Delaware corporation formed in 2010 and headquartered in Lisle, Illinois, that became a publicly-traded company in 2011.  SunCoke is the largest independent producer of high-quality coke in the Americas, as measured by tons of coke produced each year and, through its predecessor entities, has approximately 55 years of coke production experience. Coke is a principal raw material in the blast furnace steelmaking process and is produced by heating metallurgical coal in a refractory oven, which releases certain volatile components from the coal, thus transforming the coal into coke.

21.     SXCP is a Delaware limited partnership formed by SunCoke in July 2012 to own and operate certain coke production facilities and logistics terminals.  SXCP also provides coal handling and/or mixing services at its logistics terminals.  SXCP licenses its advanced heat recovery cokemaking process from SunCoke.

22.     On February 4, 2019, the Board caused the Company to enter into the Merger Agreement.

23.     According to the January 4, 2019, SunCoke and SXCP issued a joint press release announcing the Proposed Transaction, stated in relevant part:

**SUNCOKE ENERGY, INC. AND SUNCOKE ENERGY PARNTERS, L.P. ANNOUNCE SIMPLIFICATION TRANSACTION FOR SUNCOKE ENERGY, INC. TO ACQUIRE ALL PUBLICLY TRADED COMMON UNITS OF SUNCOKE ENERGY PARTNERS, L.P.**

*Transaction Approved by Independent Conflicts Committee and Board of Directors for both*

*SXC and SXCP's General Partner*

**Lisle, Ill. (February 5, 2019)** – SunCoke Energy, Inc. (NYSE:

SXC) and SunCoke Energy Partners, L.P. (NYSE: SXCP) today announced that they have entered into a definitive agreement whereby SXC will acquire all outstanding common units of SXCP not already owned by SXC in a stock-for-unit merger transaction (the "Simplification Transaction"). The Simplification Transaction is expected to close late in the second quarter or early in the third quarter of 2019, subject to customary closing conditions. Pursuant to the terms of the merger agreement, SXCP unaffiliated common unitholders will receive 1.40 SXC common shares for each SXCP common unit. The SXCP unit price implied by the exchange ratio represents a 9.3% premium to SXCP's closing price on February 4, 2019 and a 12.7% premium based on SXC's and SXCP's 30-day volume weighted average prices ending February 4, 2019.

"We are pleased to announce this transaction today along with strong financial and operating results for the fourth quarter and full-year 2018," said Mike Rippey, President and Chief Executive Officer of SXC. "We believe there are clear benefits to this Simplification Transaction, as we will be able to unlock our full potential. With a simplified corporate structure, increased liquidity and improved financial flexibility, we will be better positioned to execute on our strategic growth opportunities and generate immediate and long-term value for SXC and SXCP stakeholders alike."

On behalf of SXCP, the terms of the Simplification Transaction were negotiated, reviewed and approved by the conflicts committee of the board of directors of SXCP's general partner, which committee consisted solely of independent directors. The conflicts committee also recommended that the board of directors of SXCP's general partner approve the transaction. The transaction was approved by the board of directors of SXCP's general partner and the board of directors of SXC.

**TRANSACTION BENEFITS**
- Simplifies the organizational and governance structure, reducing complexity for investors

- Creates a larger publicly-traded company, increasing public float and enhancing trading liquidity

- Immediately accretive to SXC shareholders

- SXC intends to initiate a $0.24 annual dividend per share in the first full quarter after closing the transaction

- Improved credit profile and enhanced access to capital markets lowers cost of capital

- Consolidation of cash flow and elimination of MLP distribution accelerates objective of reducing leverage

- Estimated cost synergies of approximately $2 million per year from eliminating dual public company requirements and estimated cash tax savings of approximately $40 million over the next five years

- More cash flow available to deploy for organic growth projects, attractive M&A opportunities and/or to return capital to shareholders

- Eliminates MLP qualifying income limitations on growth

**SIMPLIFICATION TRANSACTION DETAILS**

Pursuant to the terms of the merger agreement, SXC will acquire all of the outstanding SXCP common units that it does not already own. SXCP common unitholders will be entitled to receive 1.40 shares of SXC per SXCP unit. SXCP anticipates that the Simplification Transaction will not close prior to the record date for the distribution relating to the first quarter of 2019. In addition, SXCP common unitholders will receive a prorated distribution per unit, payable in SXC common shares and based upon a quarterly distribution of $0.40 per unit, for the period beginning with the first day of the most recent full calendar quarter with respect to which an SXCP unitholder distribution record date has not occurred (or if there is no such full calendar quarter, then beginning with the first day of the partial calendar quarter in which the closing occurs) and ending on the day prior to the close of the merger, as provided in the merger agreement.

Following completion of the Simplification Transaction, SXCP will become a wholly-owned subsidiary of SXC, SXCP's common units will cease to be publicly traded and SXCP's incentive distribution rights will be eliminated. Additionally, SXCP's 7.50% Senior Notes due 2025 will remain outstanding. Completion of the merger is subject to customary closing conditions, including the approval by holders of a majority of the outstanding SXC common shares and SXCP common units, as well as customary regulatory approvals. SXC indirectly owns a sufficient percentage of the SXCP common units to approve the transaction on behalf of the holders of SXCP common units.

**The Proxy Omits Material Information**

24.     On April 11, 2019, Defendants filed a materially incomplete and misleading Proxy with the SEC.  The Individual Defendants were obligated to carefully review the Proxy before it was filed with the SEC and disseminated to the Company's stockholders to ensure that it did not contain any material misrepresentations or omissions.  However, the Proxy misrepresents or omits material information that is necessary for the Company's stockholders to make an informed voting decision in connection with the Proposed Transaction.

25.     First, the Proxy fails to provide sufficient information regarding financial projections for SunCoke that were prepared by Company management.

26.     Specifically, the Proxy states on page 64 that Evercore conducted a "discounted cash flow analysis of SunCoke's directly-held assets."  However, the *Unaudited Financial Projections of SunCoke and SXCP* section of the Proxy fails to disclose *any* financial projections for SunCoke's directly-held assets.  *See* Proxy at 46.  As a result, the Proxy materially misleads Company stockholders by entirely failing to disclose what specific projected financial metric was the fundamental input underlying Evercore's discounted cash flow ("DCF") analysis for SunCoke.

27.     Furthermore, the Proxy provides several non-GAAP (generally accepted accounting principles) financial metric for SunCoke, including Adjusted EBITDA and Distributable Cash Flow, but fails to disclose the line-item projections for the specific metrics, adjustments, and/or inputs that are used to calculate the Non-GAAP financial measure or provide a reconciliation of the Non-GAAP measures to the most directly comparable GAAP financial measure, such as Net Income.  *See* Proxy at 46.

28.     The Proxy defines Standalone SunCoke Adjusted EBITDA as:

[E]arnings before interest, taxes, depreciation and amortization

("EBITDA"), adjusted for non-recurring items and excluding the impact of transaction costs related to the simplification transaction. Standalone SunCoke Adjusted EBITDA refers to adjusted EBITDA attributable to SunCoke excluding GP/LP distributions from SXCP and cash distributions made by Indiana Harbor in respect of non-controlling interests and related capital expenditure reimbursements, and includes SunCoke's 100% interests in Jewell Coke, Brazil, and Dismal River Terminal, 85.2% interest in Indiana Harbor, 2% interests in Middletown, Haverhill, and Granite City, and SunCoke's corporate and other costs.

*Id.* However, the Proxy entirely fails to disclose SunCoke's projected: (i) earnings; (ii) interest; (iii) taxes; (iv) depreciation and amortization; (v) non-recurring items; (vi) GP/LP distributions from SXCP; and (vi) cash distributions made by Indiana Harbor in respect of non-controlling interests and related capital expenditure reimbursements. *See id.*

29.     The Proxy defines Standalone SunCoke's Cash Available for Dividends – Adjusted as "Standalone SunCoke Adjusted EBITDA, computed as described above, less standalone maintenance capital expenditures, interest expense, cash taxes, and excluding certain noncash items," but fails to disclose SunCoke's projected: (i) inputs comprising the Company's Adjusted EBITDA; (ii) maintenance capital expenditures; (iii) interest expense; (iv) cash taxes; and (v) certain noncash items. *See id.*

30.     The Proxy defines Adjusted EBITDA attributable to SXCP as:

Adjusted EBITDA represents EBITDA, adjusted for non-recurring items and excluding the impact of transaction costs related to the simplification transaction. Adjusted EBITDA attributable to SXCP includes 100% interests in Convent Marine Terminal, Kanawha River Terminal, and Lake Terminal, 98.0% interests in Middletown, Haverhill, and Granite City, and SXCP's corporate costs.

*Id.* However, the Proxy entirely fails to disclose SXCP's projected: (i) EBITDA, and the inputs comprising SXCP's EBITDA (*i.e.,* earnings, interest, taxes, depreciation and amortization); and (ii) transaction costs related to the simplification transaction. *See id.*

31.     Likewise, the Proxy fails to provide sufficient information regarding financial projections for SXCP that were also prepared by Company management.

32.     The Proxy defines SXCP's Distributable Cash Flow as "Adjusted EBITDA attributable to SXCP, computed as described above, less net cash paid for interest expense, ongoing capital expenditures, accruals for replacement capital expenditures, cash taxes, and adjusted for deferred revenue," but fails to disclose SXCP's projected: (i) inputs comprising the SXCP's Adjusted EBITDA; (ii) net cash paid for interest expense; (iii) capital expenditures; (iv) accruals for replacement capital expenditures, cash taxes, and adjusted for deferred revenue. *See id.*

33.     Finally, the Proxy states that Evercore reviewed and utilized "certain projected cost savings and U.S. federal income tax synergies to result from the Merger."  Proxy at 59 (*i.e.,* the "Projected Cost Savings and Synergies").  However, the Proxy also entirely fails to disclose the Projected Cost Savings and Synergies.  Such information is particularly material to SunCoke stockholders in light of the fact that the Board specifically evaluated the Projected Cost Savings and Synergies and found it, among other reasons, "as generally positive or favorable in arriving at its determination, approvals and recommendation,"  Proxy at 40, and that the Projected Cost Savings and Synergies were also relied upon and utilized by Evercore in connection with rendering the valuation analyses underlying its fairness opinion.

34.     The SunCoke and SXCP projections and Projected Cost Savings and Synergies served as primary reasons for the Board to approve the Proposed Transaction, and were integral for Evercore to find the Merger Consideration is "fair" to SunCoke stockholders.  The SunCoke and SXCP projections and Projected Cost Savings and Synergies are plainly material and speak squarely to the question that the Company's stockholders must answer in determining whether to

vote in favor of the Proposed Transaction: is a smaller stake in the combined company more or less valuable than a full stake in the standalone company?  Without the SunCoke and SXCP projections and Projected Cost Savings and Synergies, Defendants present the Company's stockholders with only a fraction of the equation, rendering them unable to answer this question and assess the fairness of the Proposed Transaction.  Thus, the SunCoke and SXCP projections and Projected Cost Savings and Synergies are plainly material to stockholders and must be disclosed.

35.    With respect to Evercore's *Discounted Cash Flow Analysis* for SXCP, the Proxy is materially misleading and incomplete because it fails to disclose: (i) the specific projected input from the SXCP Financial Projections that the DCF analysis is based upon; (ii) the inputs and assumptions underlying the selection of the range of discount rates of 8.0% to 9.5%; (ii) the inputs and assumptions underlying the selection of the range of EBITDA exit multiples of 7.5x to 9.5x; (iii) the inputs and assumptions underlying the selection of the range of perpetuity growth rates of 0.0% to 2.0%; and (iv) the net present value of the projected cash tax benefit resulting from remedial income allocations to SunCoke.  *See* Proxy at 61.

36.    Similarly, respect to Evercore's *Discounted Cash Flow Analysis* for SunCoke, the Proxy is materially misleading and incomplete because it fails to disclose: (i) the specific projected input from the SunCoke Financial Projections that the DCF analysis is based upon; (ii) the inputs and assumptions underlying the selection of the range of discount rates of 11.0% to 13.0%; (ii) the inputs and assumptions underlying the selection of the range of EBITDA exit multiples of 5.5x to 7.5x; (iii) the inputs and assumptions underlying the selection of the range of perpetuity growth rates of 0.0% to 2.0%; and (iv) the implied enterprise value ranges calculated in the DCF analysis of SunCoke's directly-held assets; (v) SunCoke's net cash as of January 1, 2019; and (vi)

SunCoke's liability for pneumoconiosis benefits as of January 1, 2019.  *See* Proxy at 64.

37.    These key inputs are material to SunCoke stockholders, and their omission renders the summaries of Evercore's DCF analyses for SXCP and SunCoke incomplete and misleading. As one highly-respected law professor explained regarding these crucial inputs, in a DCF analysis a banker takes management's forecasts, and then makes several key choices "each of which can significantly affect the final valuation."  Steven M. Davidoff, Fairness Opinions, 55 Am. U.L. Rev. 1557, 1576 (2006).  Such choices include "the appropriate discount rate, and the terminal value…" *Id.*  As Professor Davidoff explains:

> *There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value.  For example, a change in the discount rate by one percent on a stream of cash flows in the billions of dollars can change the discounted cash flow value by tens if not hundreds of millions of dollars*….This issue arises not only with a discounted cash flow analysis, but with each of the other valuation techniques.  *This dazzling variability makes it difficult to rely, compare, or analyze the valuations underlying a fairness opinion* **unless full disclosure is made of the various inputs in the valuation process, the weight assigned for each, and the rationale underlying these choices**. The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness.  This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions.

*Id.* at 1577-78 (emphasis added).    Without the above-mentioned information, SunCoke stockholders cannot evaluate for themselves the reliability of Evercore's *Discounted Cash Flow Analysis* for SXCP and SunCoke, make a meaningful determination of whether the implied equity value per share ranges reflect the true values of SXCP and SunCoke or was the result of an unreasonable judgment by Evercore, and make an informed decision regarding whether to vote in favor of the Proposed Transaction.

38.    With respect to Evercore's *Precedent M&A Transaction Analysis*, the Proxy fails

to disclose the individual multiples Evercore calculated for each of the transactions utilized in the analysis.  *See* Proxy at 61-62.  A fair summary of the *Precedent M&A Transaction Analysis* requires the disclosure of the individual multiples for each transaction utilized; merely providing the mean and median multiples that a banker calculated to render values for SXCP is insufficient, as stockholders are unable to assess whether the banker selected the appropriate transactions, or, instead, selected certain, inapplicable transactions in order to present an analysis that supported and illustrated the "fairness" of the Merger Consideration.  Furthermore, the analysis states that Evercore adjusted "debt and cash as of January 1, 2019, and dividing by total units outstanding as of January 1, 2019," *see* Proxy at 62, but fails to disclose the values of those adjustments. Accordingly, the omission of the individual multiples and the values of the adjustments that were made to the analysis renders the summary of the Evercore's *Precedent M&A Transaction Analysis* set forth on pages 61 through 62 of the Proxy materially incomplete and misleading.

39.     Similarly, Evercore's *Peer Group Trading Analysis* for SXCP and *Precedent M&A Transaction Analysis* and *Peer Group Trading Analysis* for SunCoke fail to disclose the individual multiples for each company and transaction utilized, in addition SunCoke's net cash as of January 1, 2019, and SunCoke's liability for pneumoconiosis benefits as of January 1, 2019, which were omitted in the *Precedent M&A Transaction Analysis* and *Peer Group Trading Analysis* for SunCoke.  *See* Proxy at 63, 64-67.  For the same reasons mentioned above, the failure to disclose the individual multiples and SunCoke's net cash and liability for pneumoconiosis benefits as of January 1, 2019, renders the summary of each analysis materially incomplete and misleading.

40.     Finally, the Proxy also fails to disclose or misstate material information relating to the potential conflict of interest Evercore faced as a result of the prior work it's performed for SunCoke.

41.   Specifically, the Proxy states that "[p]rior to this engagement, Evercore and its affiliates provided financial advisory services to SunCoke and had received fees for the rendering of these services including the reimbursement of expenses."  Proxy at 69.  However, the Proxy fails to disclose the specific work Evercore performed for SunCoke and the fees received in connection therewith.

42.   Such information is material to SunCoke stockholders.  Indeed, it is imperative for stockholders to be able to understand what factors might influence the financial advisor's analytical efforts.  A financial advisor's own financial interest in a proposed merger must be carefully considered in assessing how much credence to give its analysis.  A reasonable stockholder would want to know about any economic motivations the advisor, employed by a board to assess the fairness of the merger to the shareholders, might have.  Especially when that motivation could rationally lead the advisor to favor a deal at a less than optimal price, because the procession of a deal was more important to him than approving a deal at a truly fair price to stockholders.  Consequently, the omission of the specific work Evercore performed for SunCoke and the fees received in connection therewith renders the Proxy incomplete and misleading.

43.   Defendants' failure to provide the foregoing material information renders the statements in the Proxy false and/or materially misleading.

44.   In sum, the omission of the above-referenced information renders the Proxy materially incomplete and misleading, in contravention of the Exchange Act.  Absent disclosure of the foregoing material information prior to the upcoming special meeting of the Company's stockholders, Plaintiff will be unable to make an informed decision regarding whether to vote his shares in favor of the Proposed Transaction, and he is thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## COUNT I

**Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9**

45.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

46.     Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title." 15 U.S.C. § 78n(a)(1).

47.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that proxy communications shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

48.     The omission of information from a proxy will violate Section 14(a) and Rule 14a-9 if other SEC regulations specifically require disclosure of the omitted information.

49.     Defendants have issued the Proxy with the intention of soliciting the Company's common stockholders' support for the Proposed Transaction.  Each of the Individual Defendants reviewed and authorized the dissemination of the Proxy, which fails to provide critical information regarding, amongst other things: (i) financial projections for SunCoke, SXCP, and the Projected Cost Savings and Synergies that were prepared by Company management; (ii) the valuation

analyses performed by Evercore in support of its fairness opinion; and (iii) the potential conflict of interest Evercore faced as a result of the prior work its performed for SunCoke.

50.    In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading.  Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a).  The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy, but nonetheless failed to obtain and disclose such information to the Company's common stockholders although they could have done so without extraordinary effort.

51.    The Individual Defendants knew or were negligent in not knowing that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon most if not all of the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction; indeed, the Proxy states that Evercore reviewed and discussed its financial analyses with the Board, and further states that the Board considered the financial analyses provided by Evercore, as well as its fairness opinion and the assumptions made and matters considered in connection therewith.  Further, the Individual Defendants were privy to and had knowledge of the projections for the Company and the details surrounding the process leading up to the signing of the Merger Agreement.  The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading. Indeed, the Individual Defendants were required to, separately, review Evercore's analyses in

connection with their receipt of the fairness opinions, question Evercore as to its derivation of fairness, and be particularly attentive to the procedures followed in preparing the Proxy and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

52.     The Individual Defendants were, at the very least, negligent in preparing and reviewing the Proxy.  The preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence.  The Individual Defendants were negligent in choosing to omit material information from the Proxy or failing to notice the material omissions in the Proxy upon reviewing it, which they were required to do carefully as the Company's directors.  Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and preparation and review of the Company's financial projections.

53.     SunCoke is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Proxy.

54.     The misrepresentations and omissions in the Proxy are material to the Plaintiff, who will be deprived of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the special meeting of the Company's stockholders.  Plaintiff has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

**Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act**

55.     Plaintiff incorporates each and every allegation set forth above as if fully set forth

herein.

56.     The Individual Defendants acted as controlling persons of SunCoke within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of SunCoke, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

57.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

58.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same.  The Proxy contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction.  They were thus directly involved in preparing this document.

59.     In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement.  The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered.  The Individual Defendants participated in drafting and/or gave their

input on the content of those descriptions.

60.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

61.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

62.     Plaintiff has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can the Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.     Preliminarily and/or permanently enjoining Defendants and their counsel, agents, employees, and all persons acting under, in concert with, or for them, from proceeding with, consummating, or closing the Proposed Transaction, unless and until Defendants disclose the material information identified above which has been omitted from the Proxy;

B.     Rescinding, to the extent already implemented, the Merger Agreement or any of the terms thereof, or granting Plaintiff rescissory damages;

C.     Directing the Defendants to account to the Plaintiff for all damages suffered as a result of their wrongdoing;

D.     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

E.      Granting such other and further equitable relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.


Dated: May 8, 2019                               **MONTEVERDE & ASSOCIATES PC**

                                                  By: _/s/ Juan E. Monteverde_
                                                      Juan E. Monteverde (JM-8169)
                                                      The Empire State Building 350 Fifth
                                                      Avenue, Suite 4405 New York, NY 10118
                                                      Tel:(212) 971-1341
                                                      Fax:(212) 202-7880
                                                      Email: jmonteverde@monteverdelaw.com

                                                      *Attorneys for Plaintiff*